# IN THE SUPREME COURT OF IOWA

No. 97 / 05-1410

Filed March 28, 2008

BARRY C. SIMPSON and STACY
SIMPSON, Husband and Wife, DAVID
GERBER and KATHY GERBER, Husband
and Wife, JEREMY WALKER and KAYLA
WALKER, Husband and Wife, JEFF
WEBER and TRACY WEBER, Husband
and Wife, LEROY F. WEBER and AUDREY
H. WEBER, Husband and Wife, KEN
WITHAM and CINDY L. WITHAM, Husband
and Wife, TERRY W. WARMBIER and
CAROL WARMBIER, Husband and Wife,
HOWARD P. SWANSON and H. AILEEN
SWANSON, Husband and Wife, EUGENE K.
LEMKEE and SHARON LEMKEE, Husband
and Wife, DUANE HEINEN and SHARON K.
HEINEN, Husband and Wife, EARL LOSS
and JUANITA LOSS, Husband and Wife,
THOMAS M. ALTMAN and MARLENE ALTMAN,
Husband and Wife, J.W. GARDNER and KAREN
GARDNER, Husband and Wife, RONALD FRANKL
and PAMELA FRANKL, Husband and Wife,
BOB CASEY and TRISH CASEY, Husband and
Wife, RICHARD N. KOHLHAAS and RICHARD
G. THOMPSON,

     Appellants,

vs.

LUKE KOLLASCH, CHARLIE KOLLASCH,
KOLLASCH LAND AND LIVESTOCK, INC., GENERAL
DEVELOPMENT, L.L.C., a/k/a GENERAL
DEVELOPMENT CORP., DONALD R. TIETZ,
JOHN MERTZ, NICHOLAS BERTE, DEAN
BERTE, KEVIN BERTE and CRAIG BERTE,

     Appellees.

---

Appeal from the Iowa District Court for Kossuth County, Patrick M.

Carr, Judge.

Neighbors of a proposed hog confinement appeal the district court decision dismissing their petition for anticipatory nuisance. **AFFIRMED.**

David J. Stein, Jr. and David J. Stein, Sr. of Stein Law Office L.L.P., Milford, for appellants.

Sean P. Moore and Michael R. Blaser of Brown, Winnick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellees.

**STREIT, Justice.**

No one wants to live near a hog confinement operation. Neighbors of two proposed hog confinement facilities filed an anticipatory nuisance claim against the developers of the confinement facilities and the owners of the land where manure from the operations was to be spread. While the neighbors raised legitimate concerns, our role in this case is not akin to a zoning board. An injunction based on an anticipatory nuisance is an extraordinary remedy and requires proof a nuisance will necessarily result from the developers' proposal. Because the neighbors have not met this high burden, we affirm the district court's denial of an injunction.

## I. Facts and Prior Proceedings.

In early 2003, General Development L.L.C.[1] filed two separate applications with the Iowa Department of Natural Resources (DNR) for permits to construct confined animal feeding operations (CAFOs) in Sherman Township, Kossuth County. General Development referred to the operations, which were to be located approximately two miles apart, as "Sow 1" and "Sow 2."[2] The facilities were designed to store all manure in concrete pits under the buildings. According to a manure management plan for each facility, the manure would be spread once a year on nearby farmland.

In May 2003, General Development published notices in the *Algona Upper Des Moines* newspaper stating its intent to build the two CAFOs. A

---

[1] There are numerous defendants in this action: General Development L.L.C. a/k/a General Development Corp. and Kollasch Land and Livestock, Inc. are companies owned by Luke Kollasch and Charlie Kollasch. John Mertz owns the property where the proposed facilities are to be located. Donald R. Tietz, Kevin Berte, Dean Berte, Craig Berte, and Nicholas Berte entered into manure easement agreements with Kollasch Land and Livestock, Inc. which allow manure from the proposed facilities to be spread on their respective lands. Throughout our opinion, we will simply refer to the defendants as "General Development."

[2] These proposed facilities were identical in size.

public meeting was held. The Kossuth County Board of Supervisors submitted a list of concerns to the DNR. In August 2003, the DNR issued permits for the construction of Sow 1 and Sow 2. In its "Notice of Issuance of Construction Permits" to the Board, the DNR addressed the concerns raised by the Board and rejected them.

Prior to the issuance of the permits, the plaintiffs, who are all neighbors of the proposed facilities (hereafter "neighbors"), filed this case alleging nuisance and anticipatory nuisance. General Development filed counterclaims, which were eventually dismissed without prejudice. The district court granted partial summary judgment in favor of General Development and dismissed the neighbors' nuisance claim.

At the bench trial for the anticipatory nuisance claim, General Development presented evidence the permit for Sow 2 had expired. Luke Kollasch testified he had no current plans to build Sow 2 although he acknowledged he may later reapply for a permit for Sow 2. Luke testified his plans for Sow 1 were unchanged. Sow 1 would house 10,900 pigs (5400 sows, 2500 gilts, and 3000 sucking pigs). General Development would compost approximately 2500[3] dead pigs a year and store and spread approximately five million gallons of manure. Several neighbors testified regarding their concerns about the proposed CAFOs. Both parties provided expert and lay testimony with respect to potential odors, water contamination, health effects, and reduction in property values. Additionally, several individuals testified concerning their negative experiences living near General Development's existing CAFOs. The district court found the neighbors failed to prove an anticipatory nuisance and dismissed their petition. On appeal, the neighbors allege the district court

---

[3]Based on the record, it appears Sow 1 was expected to compost 260 sows and the rest would be gilts and preweaned pigs.

erred (1) by only considering the Sow 1 facility; (2) by considering DNR standards and regulations; and (3) by concluding Sow 1 would not necessarily constitute a nuisance. General Development claims the district court properly found the neighbors failed to meet their burden of proof. It notes the neighbors are free to bring a nuisance claim if their concerns are realized once Sow 1 is in operation.

## II.     Scope of Review.

Cases tried in equity are reviewed de novo. Iowa R. App. P. 6.4. "[W]e give weight to the findings of fact made by the trial court in this case, especially with respect to the credibility of witnesses, but are not bound by those findings." *Owens v. Brownlie*, 610 N.W.2d 860, 865 (Iowa 2000).

## III.    Merits.

**A.     Whether the District Court Erred by Only Considering the Sow 1 Facility.** The district court's ruling did not make any findings of fact or conclusions of law with respect to Sow 2, other than the permit had expired. The neighbors filed a motion requesting the court to enlarge and amend its ruling to address Sow 2. The neighbors noted "nothing is preventing the Defendants from reapplying for and being granted the permit for Sow 2 . . . ." In its ruling on the motion to enlarge, the district court stated because "Sow Two is not presently threatening the Plaintiffs," "there is no anticipated nuisance to be enjoined with respect to Sow Two." On appeal, the neighbors contend the district court erred by not considering Sow 2. We disagree.

It would be entirely speculative to rule on Sow 2. At this juncture, General Development has no plans to construct Sow 2. When or if it decides to develop that CAFO, General Development must obtain a new construction permit from the DNR. We have no way of predicting future circumstances if that were to occur. For example, General Development

may submit a revised plan, the law with respect to CAFOs may change, or some of the neighbors may move in the meantime. Since General Development applied for its original permits, the Kossuth County Board of Supervisors adopted the "master matrix" which requires anyone seeking a permit today to comply with the master matrix statute. *See* Iowa Code § 459.305. This statute also allows the Board to file a formal appeal with the DNR regarding the issuance of any new permits. *See id.* § 459.304. Thus, the issue with respect to Sow 2 is moot and the district court appropriately limited its ruling to Sow 1. *See Rhiner v. State,* 703 N.W.2d 174, 176 (Iowa 2005) ("[C]ourts do not decide cases when the underlying controversy is moot.").

**B.** **Whether the District Court Erred by Considering DNR Standards and Regulations.** The district court allowed General Development to admit evidence of its compliance with DNR standards and regulations. The neighbors argue the district court should not have considered evidence of compliance because " 'a lawful business, properly conducted, may still constitute a nuisance if the business interferes with another's use of his own property.' " *Weinhold v. Wolff,* 555 N.W.2d 454, 461 (Iowa 1996) (quoting *Valasek v. Baer,* 401 N.W.2d 33, 35 (Iowa 1987)). While compliance with regulations is not a defense to a nuisance claim, we agree with the district court this evidence was relevant. *See* Iowa R. Evid. 5.401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). *But see Andrews v. Western Asphalt Paving Corp.,* 193 Iowa 1047, 1052, 188 N.W. 900, 902 (1922) (holding it was not error to refuse to permit defendants to show the plant, which caused the nuisance, was operated and constructed in a usual manner). As the district court stated,

"compliance with standards designed to avoid nuisances might in fact be some evidence that a nuisance would not necessarily result from the operation."

**C.    Whether the District Court Erred by Holding the Neighbors Failed to Prove an Anticipatory Nuisance.**    The neighbors claim the proposed CAFO, if brought into operation, will constitute a nuisance and should be enjoined in advance.  A nuisance is "[w]hatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property."  Iowa Code § 657.1; *see id.* § 657.2(1) (explaining nuisances include "[t]he erecting, continuing, or using any building or other place for the exercise of any trade, . . . which, by occasioning noxious exhalations, unreasonably offensive smells, or other annoyances, becomes injurious and dangerous to the health, comfort, or property of individuals or the public").  "An 'anticipated' nuisance would be whatever threatens to fulfill the statutory definition, if it were to come to fruition."  *Rutter v. Carroll's Foods of the Midwest, Inc.*, 50 F. Supp. 2d 876, 884 (N.D. Iowa 1999).  We have previously said,

> An anticipated nuisance will not be enjoined unless it clearly appears a nuisance will necessarily result from the act . . . it is sought to enjoin.  Relief will usually be denied until a nuisance has been committed where the thing sought to be enjoined may or may not become such, depending on its use or other circumstances.

*Livingston v. Davis*, 243 Iowa 21, 31, 50 N.W.2d 592, 599 (1951) (citing *Amdor v. Cooney*, 241 Iowa 777, 784, 43 N.W.2d 136, 141 (1950)).  This standard is akin to our "clear and convincing evidence" standard.  *See King v. King*, 291 N.W.2d 22, 24 (Iowa 1980) ("Clear and convincing evidence is a standard that lies somewhere between a preponderance of evidence and evidence beyond a reasonable doubt.").

In its ruling, the district court stated "[t]he evidence in the record convinces the Court that with careful and diligent operation, this facility need not necessarily constitute a nuisance even to the closest neighbors, the Caseys, at one mile away." We agree. While the neighbors' concerns are understandable, they have failed to meet their burden of proof for an anticipated nuisance.

The neighbors are all long-time residents of the area where Sow 1 is proposed to be located. Robert and Patricia Casey live one mile northwest of Sow 1. Ken and Cynthia Witham live about 1.1 mile north/northwest of Sow 1. Jeff Weber lives a little over two miles northwest of Sow 1. Except for the Caseys and Withams, none of the neighbors live within two miles of the proposed location for Sow 1. All of the neighbors who testified either in person or by deposition expressed concerns about health issues, water quality issues, odor issues, and a perception property values would decline. We address each of these issues in turn.

1.    *Health issues.* Some of the neighbors testified they had health concerns if General Development was allowed to go forward with this facility. None of them claimed present adverse effects from other CAFOs presently in the vicinity. Some of the neighbors have existing health conditions they fear will worsen with the presence of Sow 1. Jeff Weber has had a kidney transplant and is required to take immunosuppressant drugs. He is concerned biologic agents from the proposed facility may cause him infection in light of his compromised immune system. Eugene Lemke lives three miles east/northeast of the proposed facility and suffers from emphysema and asthma. Pam Klein has had a liver transplant and Marlene Altman suffers from a lung problem. However, when determining whether a nuisance exists, the fact finder uses a "normal person standard" to determine whether a nuisance involving personal discomfort or annoyance

is significant enough to constitute a nuisance. *Weinhold*, 555 N.W.2d at 459.

We agree with the district court the evidence concerning health issues is speculative due to the distance the neighbors live from the site of the proposed facility. Dr. Stephanie Seemuth, an osteopathic physician, testified on behalf of the neighbors. She testified Sow 1 will cause "negative health risk to people around it." On cross-examination, Dr. Seemuth conceded these effects will not "necessarily result" from the location and operation of the proposed facility. The studies upon which she relied dealt with children living on farms with CAFOs and workers exposed daily to the fumes and dusts of CAFOs. The neighbors presented no credible evidence a serious health threat is posed to normal individuals living one or more miles from a CAFO.

2. *Water quality issues.* The neighbors expressed concerns about the potential for groundwater contamination. The neighbors obtain their drinking water from wells, some of which are shallow. For example, the Caseys rely on a forty-foot well. The site of Sow 1 is low and in wet years has standing water. Mel Berryhill, who was the operator of the Milford, Iowa, water plant for eighteen years, testified on behalf of the neighbors. He explained the water table in the vicinity is three to six feet underground and the proposed facility will be ten to eleven feet deep. He testified there is an alluvial aquifer in the area. According to Berryhill, there is a "high to moderate" potential for well and aquifer contamination. He noted there is an agricultural drainage well located a mile to a mile-and-a-half away from the proposed facility.

Dennis Johnson, an engineer from Windom, Minnesota, who often works for developers of hog confinement facilities, testified for General Development. According to Johnson, all of the concerns expressed by the

neighbors have been addressed. The manure pit will be made of heavily reinforced concrete cement. The ground elevation has been raised so the top of the pit will be four-and-a-half feet above the 100-year flood level. The agricultural drainage well is scheduled to be closed. An intermittent stream near the proposed facility will be relocated. Tile will be installed around the footing of the concrete pits to artificially lower the ground water. Moreover, the DNR concluded the engineer had adequately addressed concerns about groundwater contamination. We agree with the district court the neighbors failed to prove groundwater contamination will necessarily result from Sow 1.

3.    *Odor issues.* It is undisputed hog manure stinks. Dr. James Moore, a retired professor from Oregon State University with a Ph.D. in livestock waste systems, testified on behalf of the neighbors. He opined the neighbors will be "negatively influenced," the use of their property will be "impacted," and they will regard the proposed facility as a nuisance. He said a deep pit system is one of the most odor-producing systems that can be used to raise hogs because it stores the waste in pits for up to twelve months and gives the waste an opportunity to anaerobically break down. However, he conceded deep pit storage such as the one planned for Sow 1 is by far the most predominant type of manure storage used in Iowa and the upper Midwest. Dr. Moore noted fans will withdraw the gases generated by the manure and place them in the atmosphere, which can impact the neighbors. He acknowledged with "very attentive" operators, the process of "knifing" or "injecting" manure into the soil will "significantly" reduce odor. He also acknowledged tree lines have been shown to reduce odor.

In response, General Development called Dr. Dwaine Bundy. Dr. Bundy is retired from Iowa State University and currently is a consultant for hog confinement operators. He testified management

practices have a significant impact on odor, such as including additives in the deep pit, cleaning, and type of feed. He testified one advantage of the deep pit system is that less surface area of the manure is exposed, which causes a reduction in odor. Dr. Bundy stated he would not expect a nuisance to occur at a half to one mile away or more. He claimed spreading manure by injection can cause a thirty to ninety percent reduction in odor at the time of application and no appreciable odor should remain after twenty-four hours. Eric Wiklund from the DNR testified most complaints about odor come from people living less than a mile from a CAFO.

We agree with the district court it is "debatable" whether the odors produced by Sow 1 will rise to the level of an actionable nuisance. Dr. Moore and Dr. Bundy agree the level of odor will depend on the type of manure management system (here a deep pit system), distance between the facility and the neighbors, direction of the prevailing winds, the method and means of handling manure, location of trees, and the skills of the operators applying the manure to the fields. Until the facility is in operation, we cannot say it inevitably will produce odors which qualify as a nuisance.

4.      *Property value concerns.*  Finally, the neighbors also expressed concerns their property values will decrease as a result of Sow 1. James Kesterson, an appraiser and realtor from Fort Dodge, Iowa, testified on behalf of the neighbors. He opined some properties in the vicinity would suffer a loss in value because people do not want to live near a hog confinement facility. Kesterson did not specify which properties would decrease in value nor did he quantify the expected loss in value. On cross-examination, he was asked, given the number of existing CAFOs already in the area, whether one more would cause a reduction in value. Kesterson said it would "depend."

Two experts testified for General Development with respect to Sow 1's impact on property values. Dr. Bruce Babcock, an economics professor at Iowa State University, testified about a study he conducted on behalf of the Center for Agriculture and Rural Development. The study found a new CAFO within a quarter of a mile of a residence may reduce the value of the property by ten percent. The perceived loss in value falls steeply when the new facility is a half mile away and at one-and-a-half miles away, the impact is negligible. Fred Greder, an independent fee appraiser, also testified. He acknowledged a reduction in property values may occur, but it was not probable. In his opinion, there are several factors bearing on whether a decline in the value of any particular property will occur: (1) the highest and best use of the property; (2) distance; (3) direction from unit to account for prevailing wind; (4) whether the CAFO is within view of the property in question; (5) the size of the CAFO; (6) whether manure is stored indoors or outdoors; (7) whether the property in question is modest or expensive; and (8) whether the pigs are locally owned or non-locally owned. The district court found all of the experts credible. We agree with the district court that we cannot conclude based on the conflicting evidence that property values will necessarily or certainly decline should the CAFO be built.

## IV.    Conclusion.

The neighbors' experts raised legitimate concerns regarding the operation of Sow 1. However, those experts conceded they could not be certain a nuisance will necessarily result if General Development is allowed to develop and operate Sow 1. Moreover, while the neighbors' attorney argued the defense experts were biased toward the hog industry, the district court found those experts credible, at least to the extent their testimony cast doubt on whether Sow 1 would cause a nuisance.

In recent years, hog confinement operations have become more controversial as they grow in number and size. Our task here is a narrow one—we are asked to determine whether the neighbors have proven an anticipatory nuisance. We agree with the district court they have not.

**AFFIRMED.**

All justices concur except Larson, J., who takes no part.